Good afternoon. May it please the Court. Thank you. May it please the Court. My name is Andrew Ogden. I'm appearing for Appellate Conservation Congress. With your permission, I would like to reserve two minutes of my time for rebuttal. The time shown is the total time you have. Thank you, Your Honor. Before addressing the merits of this case, I wish to highlight its implications for the survival and recovery of the Northern Spotted Owl. By positioning the Spotted Owl under the Endangered Species Act, we have made a societal commitment not only to preventing extinction of the species, but to the goal of recovering the Northern Spotted Owl to the point where it will no longer need the protections of the Endangered Species Act. To be clear, this is not a case brought under the ESA, but rather under the National Forest Management Act, or NFMA. This statute governs the management of the public lands that provide almost all of the remaining old-growth forests that are the Spotted Owl habitat. Only through the careful management of these forests will the habitat necessary for the recovery of the Spotted Owl be conserved. I want to emphasize the importance of the 2011 revised recovery plan for the Northern Spotted Owl to reversing the steady decline of the species population. Only by addressing the principal threats to the Spotted Owl habitat loss from logging and other human activities, and from natural occurrences such as wildfire and the invasive barn owl, will this decline be reversed. The revised recovery plan identifies these and other threats to the Spotted Owl recovery, and based upon the best available science, provides the strategy, objectives, criteria, and actions necessary to bring about the recovery of the species. In addition, the recovery plan provides a framework for making balanced forest management decisions, and for addressing uncertainty in the outcomes of those decisions. All of the parties agree that the revised recovery plan provides the best available guidance for recovery of the Spotted Owl. In dispute as to what degree land managers may dismiss or disregard the revised recovery plan in making forest management decisions under the NFMA, Appella asserts the consistency of the revised recovery plan is not discretionary under the NFMA. Consistency. With this action, Appella seeks a decision that requires land managers to consider all of the management guidance and standards in the revised recovery plan. Such a ruling will embed Spotted Owl recovery in forest decision making on an equal but not greater basis with the consideration afforded to other conservation, social, and economic values. Turning to the merits of this matter, I wish to briefly first address Appella's Forest Service argument that the principal legal issue was forfeited by conservation congressmen in the district court. Contrary to the Forest Service's assertion, the issue on appeal, that is, whether the revised recovery plan has incorporated into the Chastity-Trinity National Forest Plan established as non-discretionary standards and guidelines, was raised, briefed, and decided upon in the district court. Specifically, it was extensively briefed in the Appella's opening summary judgment brief by incorporating arguments made under the Best Available Science argument under the ESA, and specifically incorporated almost seven pages of the brief into the claim that this project, the decision approving this project, was not consistent with the Forest Plan and with the NFMA. In the opposition and opening cross-motion for summary brief, the Forest Service raised the specific issue that the recovery plan was not mandatory under the NFMA. This was further briefed in the reply across summary judgment answer brief in the reply brief. Furthermore, the district court expressly relied on this issue of law in its decision when it said, under the section of the decision that says the project complies with the NFMA, the district court ruled, quote, in that decision, the court also ruled that the project is consistent with the revised recovery plan. So, I think that it was briefed, it was ruled upon, we do not concede it was not adequately pled under the feeding rules. Why don't you hold it? I don't know. Is this an issue? I think you should go on to your next point. Okay, thank you. I appreciate that. Let's turn to the issue of whether the revised recovery plan establishes mandatory management standards under the Shasta Committee National Forest Plan. This is the principal issue of law in this case. And there is no doubt that standard guideline 25H of the Forest Plan incorporates the species in the revised recovery plan by reference. Furthermore, we have a district court ruling out of the Eastern District that specifically says it is incorporated. And that's my observation, Congress' versus Forest Service. In your view, does that render it mandatory? I think that renders it as definitely incorporated. And also, that decision says that the Forest Service must comply with everybody's... That's consistent with? Consistent with. How is it clearly consistent with? That would be jumping to the parents in the case. I'll be happy to discuss those. Is that what they're going to do? I guess I... It seems to me that the plan makes recommendations, but they're not... I never thought that they were rigid. They're rather general in fact. And so I'm just wondering how there's an inconsistency between the two. And I think maybe you better get to the parents. Sure. Okay, let's just cut right to the chase then. Basically, the Forest Service is using the revised recovery plan to demonstrate its consistency with the Forest Plan and with the NISMO. Okay, so they're saying here's this revised recovery plan. They make several findings of consistency in the 2013 biological assessment. Both are incorporated in the supplemental information report, which basically validated the earlier record of decision finding consistency with the NISMO. So it's a very long timeline on this project, and the revised recovery plan actually came out while it was in process. So there's a little bit of connecting the dots between all these different documents. But basically, the Forest Service relied on consistency with the revised recovery plan, which consists of the Forest Plan. There's a basic inconsistency in saying, well, these are just recommendations and what we've complied with. And there's a case exactly on point here. Oh, are they saying they complied with them? Yeah, they are consistent. Consistent? And actually, I understand there's really no distinction in some of the decisions. There's a case brief. There's a case in the appellant's brief that basically says this court has used the terms of complied with and consistent with interchangeably in decisions under NIFA. If I say complied with, we can read consistent with as well. I'm not trying to draw a distinction and impose any greater burden by using complied with. So basically, we're just talking about being consistent with the NIFA. Okay, so are you making a distinction, too? Because some things are like may and some things are like shall, and this is not a shall or an automatic situation, is it? Okay, well, I believe you're going to the question under college-specific versus custody where there's mandatory language. And that is one of the two arguments for incorporation of this revised recovery plan into the Forest Act. And there's a whole line of, there's a line, a case, Ecology Center versus Boston, that says basically if the Forest Service relied on an advisory document to demonstrate compliance with the NIFA, then it must comply with, it must be consistent with the provisions of that advisory document. In that case, it doesn't even rely on expressive incorporation into the forest land. It just basically says reliance is what we're looking at. This addresses the fundamental inconsistency of how can you ever not be consistent with something that is just recommendations. So therefore, if there's no need to be, if there's no mandatory nature, the consistency finding is really meaningless. Is the Forest Service going to always have its finger on the scale by discussing the content? That's a problem. That's why they couldn't compare content. And here is my problem. The spotted owl needs a certain kind of habitat that includes overgrowth, that's snakes and other things, that are also, can be at high risk of fire. And if I read what's going on here, we don't have a situation where we have had people coming in and clear-cutting huge swaths of owl habitat, which we have had in previous cases under the Endangered Species Act. But what we have here is to try to maintain the forest so that it doesn't burn up. And you have to do that consistent with the recovery act that says that you have to strive to maintain the habitat for the owl. And I can't quite see, I mean, inconsistency unless you read the recovery plan as saying you can't do anything that might impact the habitat of the owl. And I don't think that we can say that that's the burden that's on the defendants here. I agree. And I agree to the extent that we're not trying to impose a rigid one-size-fits-all situation here. The revised recovery plan is a structured document that goes from objectives to strategy to implementation and then the recovery actions. What Your Honor is talking about is a very high-level decision, basically in the strategy level, like do we treat these forests to lessen the chance of wildfire, and over the long-term restore spotted owl habitat, and what if there's short-term effects to the owls? In this case, there was a take of a pair of owls in an occupied site, and there was an extensive treatments of all growth forests in the core site. The site that that pair just was in before it got driven out by barred owls. So on the big picture, though, so we have acknowledged short-term effects. On the big picture, how do you balance the long-term benefits, the long-term obligations to address wildfire, address restoration of spotted owl habitat, address other issues that the Forest Service has to balance? How do you do that without being just paralyzed? The recovery plan provides exactly that sort of analysis. And in a reply for you from page 26 and 27, we talk about the implementation of strategy, and the recovery plan says you're going to have these uncertainties. You can't not do anything, but you can't be too aggressive in doing it that you cause untoward harm. And the recovery plan provides an exact balancing standard, and that is that the benefits of the long-term treatments must clearly outweigh the short-term harm, clearly outweigh a very high standard not used anywhere else except in the Endangered Species Act itself with the God's One criteria. The Forest Service, in making the decision to treat, never even acknowledged that standard exists. As a matter of fact, it's not even in the briefings. I'd have to go back and see if it's in the bio, but I do not believe that it is. So nowhere do they even acknowledge a very simple direction of balancing according to this high standard. The same thing is seen on the ad-hoc implementation level of when they were implementing the specific recovery actions, 10 and 32, where it said that these recovery actions should go forward where you're treating in spotted house sites only if there's a determination that the benefits outweigh the burdens. The long-term benefits outweigh the short-term acknowledged harm. And that's at Excerpts of Record 0630. Again, there's nothing in the biop that evidences there was ever this sort of determination made before approving these treatments were acknowledged to cause significant short-term harm. Take is the most significant harm we have. The only thing that the Forest Service say, well, we're not actually killing owls versus grass. Well, that's still take, and you're directly affecting the ability to recover. So the recovery plan is not a straight jacket. It is a way to make balanced forest management decisions. It provides standards for making those decisions. But in the wilds, the Forest Service considerable level to considerable discretion in how to implement what it does. What we're asking is that the Forest Service not be allowed to just ignore provisions or dismiss them as recommendations. This is the best science that the Fish and Wildlife Service wrote this. It's not a standard like you have in CAST data where they talk about the mandatory language of must or will. That was one standard about elk habitat designation that they said wasn't binding enough. This is a whole document. I think it takes up pretty much all of one volume of the excerpt of record. And this document is a very carefully drafted, step-down approach to spotted owl recovery. So you can distinguish cases like Ecology Center versus CAST data by saying, well, this is a more integrated document. You have to read the thing as a whole to see if these are really just offhanded, well, it should be this, or if you're really pointing towards a more balanced and integrated plan. My struggle with this is that the district court had to look at the plan and his standard of review is arbitrary and capricious. And that's a pretty liberal standard for the Forest Service. Let me hear what you have to say about the standard of review in terms of this weighing of long-term benefits versus short-term harm. The benefit being preventing less serious fires and the short-term harm is to the owls. There was a lot of delicate balancing. And as I read, at least originally in the final supplemental environmental impact statement, it looked like the Forest Service had reviewed at least 10 alternatives of how to deal with these fires. And I really got the sense that that was a challenging thing to do. And then, you know, the judge behind it has to say that they're arbitrary and capricious in order for him to reverse the plan. So I think the standard of review is one that feels too hard to me. I don't know if you agree with that. I agree. I do agree. I think the lowest aim is a review that judges look at and you've kind of really shown arbitrary and capricious are at least a piece of discretion. Certainly. Two things. First, since this is a review of a summary judgment ruling, that review is de novo. So we're asking that the court, of course, look at the totality of the situation where the judge made this determination based on this Oregon District Court holding that a revised recovery plan is not discretionary under the DEFA. And that was an extension of that Oregon holding, which basically was working under the ESA in the Ninth Circuit decision in the Cascadia Wildlands case, clarified that recovery plans are discretionary under the ESA. It doesn't say discretionary under the DEFA. So there's two things going on here. The first is a review of this purely legal issue of to what degree does the recovery plan prescribe mandatory management standards, or as I've said, it's actually a process that's outlined in the recovery plan. The need to have a consistency under the NISPO for a project and not be arbitrary and capricious. Now, this project, let's assume the recovery plan was enforceable. So we're looking at the consistency with the recovery plan. We have two specific things, and I agree that the Forest Service did engage in extensive analysis. However, in the end, they still approved a project that has to take about the approved project where you're treating high-value old-growth forest in the core and home-range areas of two of the activity centers. And those were encountered in the evidence before the agency. And the evidence before the agency was this is quite a fact. They're going to take the adults. This is not what recovery actually contained. It's talking about this conserved spotted owl sites. So I don't see a balancing between the fire is so important, but we're going to drive the owls out of the site. I don't see that as a fair balancing. And I think if the recovery plan, if they made that determination, that the recovery plan outlines and that the Forest Service never made, they would come up with a different answer. So as far as the arbitrariness is, you have the determination of consistency, which runs counter to the evidence. Again, the failure to make those balancing according to the standards in the recovery plan is a failure to consider important aspects. The problem we're having is you're asking us to take a different path and come to a different balance. And that's hard for a court to do. That's not our function. Our function is to say, did something really go wrong? Why are we wrong? We haven't been wrong here. Your argument in your reply brief, as I read, that you referred to, was that they didn't chose the things in the recovery plan that seemed to support what they wanted to balance, that they struck in, that they ignored things that were counter to that. But it's hard for me to see that, I suppose, because it's something that's completely arbitrary there. It sounds like it's a different balance. Can you help me out on that? Yes. I think the issues you're talking about really need to be drilled down in the trial and summary judgment situation. We're asking this court for two things. One is a ruling on the issue of law is whether the recovery plan provisions are part of the forest plan by either express incorporation, as was done here, or by reliance to the Ecology Center versus Austin. And this is an interesting mix because there's no case directly on point that if you have a recovery plan that's expressed, incorporated into a forest plan, as it is here, and the Forest Service expressly says we have relied on it, does that sort of blend those two cases so you have incorporation? So we're asking the court for two things. One, a ruling on the issue of law, whether or not the recovery plan is part of the forest plan in this case. And second, a ruling whether it was inconsistent by the arbitrary accumulation standard. I think those are two different findings that I would like the court to focus on. Okay. Well, counsel, you have exceeded your time. Is that okay? Thank you very much. Are there any other questions? Questions? Good afternoon. My name is Amy Corrigan, and I'm representing the federal government in this matter. The plan has talked a lot about the goals of the revised recovery plan, the goal of recovery, the idea that you use careful management to achieve those goals. I think one of the major problems that arise in this case is that the plan has a different idea of what conservation and recovery look like. The revised recovery plan is very clear that protecting, enhancing, and maintaining habitat very frequently means active management, not just taking a hands-off approach where you wait and see what happens. Now, I was happy to hear initially that Conservation Congress no longer was arguing that the revised recovery plan includes mandatory requirements, although as counsel's argument progressed, it sounds like they still sort of are arguing that. Ecology Center v. CASI is very clear that if you want to go through a analytical process to determine whether a non-binding document becomes binding when it's either incorporated directly or referenced in a forest plan, I don't think that that is difficult to apply here. It's quite clear that the recovery plan here uses the kind of suggestive language that Ecology Center v. CASI talks about. Counsel brought up the case Conservation Congress v. Forest Service. It's a district court decision that just came out in February that analyzes a different forest plan's language, but it walks through, it applies the Ecology Center v. CASI analysis to the revised recovery plan, including Recovery Action 10. Just as we've asked you to do, and concludes that, no, this isn't mandatory.  What is this recovery plan? It's not just wholly aspirational. Well, in a sense it is. Excuse me. The recovery plan provides near-term recommendations that are intended to guide actions to accomplish recovery of the species. It provides guidance for achieving the goal of conservation of the species, essentially that the species will no longer require the protections of the Endangered Species Act. It's a very high-level document that talks about the kinds of factors that land management agencies should think about as they're designing projects. You know, if you tried to apply this document as mandatory or as requirements, I think you'd really quickly run into trouble trying to figure out what that meant. The recovery plan itself says there is no one right way to achieve recovery. It even says that we may even be able to achieve recovery without following the recommendations in this plan. The idea that you would comply or not comply with recovery actions suggests that there is a right way to do things. Well, why would you say that there has to be consistency? Right? Yes. What would you say would be something that would require any consistency? I think, as you suggested, a project, say a commercial money-making timber project that involved clear-cutting in, you know, high-quality owl habitat, that would seem to be inconsistent with the plan if it was not, you know, there was no balance being struck. Sure. Well, how about I tell you, I mean, what the Forest Service did here and the balance that it and the Fish and Wildlife Service struck. You know, one thing we've been talking a little bit about, you know, short-term benefits, I'm sorry, short-term harms versus long-term benefits. There's short-term benefits as well. So, you know, short-term benefits include reducing the risk of catastrophic loss in a late summer fire. Treatments in foraging habitat will actually open up areas that owls are currently unable to use for foraging. And meanwhile, the short-term harms of this project have been minimized through careful design that's going to avoid treating nesting roosting habitat in that occupied quarry area. Limited operating periods mean that the worst noise and smoke, which can have effects on owls, those are not going to occur during breeding season. Essentially, the Fish and Wildlife Service said, we're going to be there on the ground and make sure you're retaining forest density at the highest sustainable level that will allow you to still do what waits for a fire. I think the bias would say that if you have a plan that takes away the habitat of the owl nesting owls, that it's going to be done so that it's a consistently recovering plan. Well, this project does not remove any habitat. The owl's habitat that's being treated, some of it is going to be degraded. And that's a term of art that means that certain elements of the habitat are going to be removed, but it's going to continue to function as habitat. So it may not function quite as well in the short term, but the goal is that it both will be more resilient to these types of threats like fire, insects, competition during drought. So it will persist into the future and get better over time. So, again, we're not losing any habitat. Has there in reality been a take? This project has not yet been implemented. Well, the agency's acknowledged that there may be some harassment of this one pair. The way that it's described, I don't think it will be bad enough to either result in the death of these owls or preclude them from breeding, making demographic contributions. But it may lead to them having to change the area that they use for foraging and such, so that could happen. I'd like to touch on a waiver issue just for a moment. Getting back to is the recovery plan mandatory or not, that is an argument that we argued was raised, that it's not raised in district court. And I understand it's in your discretion to entertain this theory, during your delivery of your affair. I certainly don't think that you need to, and I don't think that you should. The theater continued to raise new arguments, even in its reply brief. And so this is a little bit of a pattern of sort of changing the theories and the argument as this case has gone along. You know, I think it's quite clear. If you look back at the briefing, which kind of is helpfully provided in its further excerpts, really the case presented to the district court looks quite different from what we're seeing here. But in any event, if you get to the question of whether the recovery plan is mandatory, the College Center versus Castaneda takes you all the way there and tells you that absolutely those recommendations are not transformed into requirements. As for a College Center versus Boston, in that case the Forest Service self-restated guidelines or standards as binding. We don't have that here. What we have here is the Forest Service treating the recovery plan as what it is, recommendations. So I don't see how that changes the game at all. And then as for when they were reviewing the merits, I would ask you to keep in mind the very deferential standard of review that this court set forth on Bog and Land Council versus McNair. That's a NIFA case, and it tells you that actions have to be consistent with the Forest plan, and that this court shouldn't make fine-grained judgments. And so you're making sure that agencies haven't made any clear error of judgment or relied on factors that Congress didn't intend them to rely upon. They haven't failed to consider anything important, and they haven't offered an explanation that's so counter to the evidence before that it couldn't be inscribed to their difference of view. That case also involved a kind of short-term, long-term, and if the terms balance in that tier, I think that's very helpful in guiding you as you assess the merits. Let me make sure that I can get this. Okay. So what is the precise rule that you used yesterday that you say is kind of wrong? Yesterday it said that in that Forest plan, the language that was at guidelines will be applied. So I would submit that's a much stronger language than the Forest plan. Last year, we're going to see these as, you know, not consistent with. Even given that strong language in the Forest plan, testimony has said the old-growth guidelines that were incorporated by reference were still not mandatory because they had, interspersed with what looked like some kind of mandatory language, they had suggestive language that kept the court from making those guidelines mandatory. So if you have no further questions. Thank you. Thank you, Your Honors. Just one quick thing. I would like to point out that the Counseling Center versus us is directly on point. And that will be the quote that basically says, the purpose of the standard is to ensure compliance with the substantive provisions of the DEFMA. The Forest Service is not explaining how it can be certain the project complies with the DEFMA if the project was not developed in accordance with the standard. Because the Regional Soil Quality Standard, they basically said that if you're relying on this, you have to comply with it. Further, the Counseling Center versus CASA Theta, that is somewhat distinguishable on its facts because in that case, that had to do with a very narrow provision of whether land should be designated as healthy habitat. And they were talking about the minimum standard and the minimum size. In that case, the plaintiffs were saying, well, that has to do with designation. The court said that that standard only applied to management. It didn't apply to designation. So it wasn't really a spot-on situation as you have here. Lastly, basically, in terms of the short-term harm, the tank speaks for itself. The cutting of old-growth, high-value habitat in the core of home ranges speaks for itself. You can talk about limited operating periods and other, you know, things to mitigate the harm. But the bottom line is that there will be significant short-term harm. The forest service did not do the balancing. And I appreciate your honors position this afternoon. Thank you very much. Thank you.
judges: Schroeder, Rawlinson, Drain